Richard A. BRINE

v.

STATE of Maine et al.

Supreme Judicial Court of Maine.

April 23, 1970.

Neil D. MacKerron, Bridgton, Charles W. Smith, Saco, for plaintiff.

John W. Benoit, Jr., Deputy Atty. Gen., Augusta, for defendants.

Before WILLIAMSON, C. J., and WEBBER, MARDEN, DUFRESNE, WEATHERBEE, and POMEROY, JJ.

POMEROY, Justice.

On October 7, 1958, Lewis C. Chandler, Jr., was found dead in a taxicab which he was employed to drive. A Cumberland County jury declared there was no reasonable doubt but that he died of a wound made by a bullet fired into his body by Richard A. Brine and the circumstances left no reasonable doubt but that Brine was guilty of the crime of murder.

Judgment that Brine remain in the custody of the Warden of the Maine State Prison for the remainder of his natural life was entered on the verdict on February 7, 1959. No appeal from this judgment was ever perfected.

Several post-conviction proceedings were instituted. Many issues flowing from Brine's conviction in 1959 have been presented to this Court. Brine v. State, 160 Me. 401, 205 A.2d 12 (1964); Brine v. State, Me., 232 A.2d 88 (1967).

The matter is presently before us on appeal from the denial of a Petition for Writ of Habeas Corpus post-conviction filed April 29, 1966.

The Petitioner advances a total of 11 claims of error. Some, he says, were made by the Justice who presided at his trial in 1959 and some, he says, were made by the Presiding Justice who denied the Petition for Writ of Habeas Corpus now before us. In his words, the errors claimed are:

I.    The Presiding Justice denied to Petitioner a fair trial by the erroneous charge to the jury which as a matter of law called for a verdict upon numerous faulty premises all in violation of the due process of law clause of the Fourteenth Amendment to the Constitution of the United States.

II.   The Trial Court erroneously made reference to a conclusion of guilty as supporting a verdict.

III.  The Trial Court shifted the burden of proof from State to Petitioner in an essential element of the offense charged.

IV.   The Trial Court failed to charge that intoxication could bar the forming of intent as contained in malice.

V.    The Trial Court violated the Petitioner's constitutional rights under the Fourteenth Amendment of the Constitution of the United States by admitting into evidence admissions obtained from the Petitioner involuntarily and under coercion; and further, the Trial Court failed to independently hear testimony as to the admissions without the presence

of the jury and made findings of fact explicit on the record that such admissions were voluntary.

VI. The Trial Court committed prejudicial and reversible error.

VII. Failure of counsel to perfect appeal for then indigent defendant.

VIII. Newly discovered evidence.

IX. The State of Maine knowingly used false evidence in violation of the due process clause of the Fourteenth Amendment of the United States Constitution.

X. That the officials of the State of Maine knowingly suppressed material evidence in favor of the Petitioner to obtain a conviction in violation of due process of the Fourteenth Amendment to the Constitution of the United States.

■ By the terms of 14 M.R.S.A. § 5502, alleged trial errors are not reviewable on post-conviction habeas corpus, Bennett v. State, 161 Me. 489, 214 A.2d 667; Lemieux v. State, Me., 240 A.2d 206; Papolas v. State, Me., 235 A.2d 533.

■ In the instant case one of the complaints made by Petitioner is, his counsel, who was court appointed, failed to perfect his appeal. He says such failure was without his knowledge and against his wishes. At the hearing before the single Justice on his present petition he failed to offer any evidence in support of his claim. The finding by the single Justice that Petitioner had failed to establish his burden of proof by a fair preponderance of the evidence is not clearly erroneous. Bennett v. State, 161 Me. 489, 214 A.2d 667.

Having arrived at the conclusion that the single Justice's finding must be sustained, it follows Petitioner has no *right* to have these alleged trial errors reviewed.

■ We are mindful, as this Court was in Papolas v. State, Me., 235 A.2d 533, the Petitioner is serving a mandatory life sentence. All the points which he raises have been thoroughly briefed and argued by able and experienced counsel representing the Petitioner by court appointment and by the Attorney General. We have the entire trial transcript before us. Without in any way intending to enlarge the scope of post-conviction habeas corpus by the precedent set in *Papolas* and this case, we propose to examine the claims of error here raised to determine whether or not there were any prejudicial trial errors which would have availed the Petitioner if an appeal had been seasonably prosecuted.[1]

■ The first claim of error relates to the instructions to the jury given by the Presiding Justice.

---

1. In Wood v. State (1965), 161 Me. 87, 207 A.2d 398; rehearing denied, Me., 221 A.2d 279, this Court adopted the rule of the 9th Circuit Court of Appeals described in Dodd v. United States, 321 F.2d 240, C.C.A. 9, and described in Desmond v. United States, 333 F.2d 378, C.C.A. 1 (1964), requiring a petitioner to show "plain reversible error at the trial in order for relief to be granted."

We are aware the Supreme Court of the United States in Rodriquez v. United States, 395 U.S. 327; 89 S.Ct. 1715; 23 L.Ed.2d 340, has reviewed the rule of the 9th Circuit and the 1st Circuit. Both *Dodd* and *Desmond* must be considered overruled.

We are also aware the 1st Circuit in Wilbur v. Maine, 421 F.2d 1327 (1970), declared the rationale of Rodriquez applies to state prisoners as well as federal prisoners. We will, therefore, no longer apply the rule of *Wood* in this State. Unlike the situation in *Wilbur*, in the instant case the Petitioner failed to offer any evidence in support of his claim that the decision to abandon the appeal was made by the attorney without his knowledge and did not constitute a voluntary waiver by him of his right to appeal. It is for that reason we declare that he had no right to have the alleged trial errors reviewed and not because he failed to demonstrate plain reversible error in the original trial.

First among these is that the Court said to the jury, *"It could not be presented to a higher Court if the case were reviewed."* The record reveals the Presiding Justice did use those words. The fact is that he made this statement while explaining that a view in a criminal case is not evidence. He had just completed telling the jury that they were the sole factfinders but they must accept the law as he gave it to them. He said they need not concern themselves with the correctness of his instructions, because if he did make an error of law, there existed an orderly procedure for the correction of such error.

Read in the context of what preceded the statement of which complaint is made, it cannot be fairly concluded he informed the jury a judicial review of their findings of fact was possible. This claim of the Petitioner is without merit.

■ Claim is made that the jury could have been misled because during the course of his charge the Court used the expression "conclusion of guilt." We have carefully examined the record and find that the Court did use these words. However, they were used during the course of his explanation of the requirement that when circumstantial evidence is relied upon for conviction, not only must each circumstance in the chain of circumstances be proved beyond a reasonable doubt, but the chain itself must be negatively tested to ascertain that the proved circumstances are not only consistent with a conclusion of guilt, but are inconsistent with any other hypothesis save guilt.

The actual language employed by the Court was as follows:

*"To do this to warrant your drawing a conclusion of guilt from proven facts the State must first prove all of the necessary facts beyond a reasonable doubt, but this is not all of the story by any means. Before a conviction may be had upon circumstantial evidence*

*alone in a criminal case, that is, a conclusion of guilt from facts all proven beyond a reasonable doubt, the accuracy and soundness of the conclusion of guilt must be negatively tested by inquiring whether the circumstances proven exclude every other rational hypothesis than that of guilt. It is not sufficient that the circumstances are all consistent with the respondent's guilt and raise a strong probability of it, but they must also exclude beyond a reasonable doubt the hypothesis of his innocence and be incapable of any other reasonable hypothesis than that of guilt."*

In our view this was an excellent, accurate, clear and understandable explanation of the rule as to the burden of the State when it seeks to convict by means of circumstantial evidence alone. This claim of error is entirely without merit.

■ Petitioner says one part of the instructions of the Presiding Justice had the effect of informing the jury the burden of proof was shifted from the State to the defendant. The exact language of which complaint is made is as follows:

*" * * * and if the accused would reduce the crime below the degree of murder, the burden is on him to rebut the inference of malice which the law raises from the act of killing, by evidence in defense."*

What the Petitioner does not tell us in his petition is that the words which preceded those quoted are:

*"Malice is implied by law from any deliberate, cruel act, committed by one person against another, suddenly, without any or without a considerable provocation. And all homicide is, as a general rule, presumed to be malicious, until the contrary appears from circumstances of alleviation to be made out by the respondent, unless they arise out of the evidence produced against him. Or, as the Court has said in another way, in all cases where the unlawful killing is*

proved beyond a reasonable doubt and there is nothing in the circumstances of the case as proved to explain, qualify or palliate the act, the law presumes it to have been done with malice aforethought, * * *"

The language complained of is an almost exact quotation from State v. Neal, 37 Me. 468 at 470, and State v. Knight, 43 Me. 11 at 137.[2]

The quotations from State v. Neal and State v. Knight, supra, about which complaint is here made, have been used by Justices presiding in practically every murder case tried in Maine since 1857. In *Knight* the Court examined this instruction. Of it, Chief Justice Tenney, speaking for the Court, said:

"The doctrine enunciated in these instructions has been much examined by courts of the highest standing, and jurists of great respectability, within a few of the last years. Uncommon learning, research, and power of ratiocination have been exhibited in support of the principle; and those who have denied its soundness have maintained the denial in arguments of distinguished ability and force. An attempt to discuss the question again cannot be expected to throw much additional light upon it. The instruction is a doctrine of the English common law, of Massachusetts, as recognized in the case of Com. v. Knapp, 9 Pick., 496; Com. v. Knapp, 10 Pick., 484; Com. v. York, 9 Met., 93; Com. v. Webster, 5 Cush. 295. It is not known to have been denied by courts of this state, but it has been expressly admitted, and the jury instructed accordingly by this court, sitting as a full court in State v. Sager, in the County of Kennebec, in the year 1834; in State v. Varney, in the County of Penobscot, in 1845, and in State v.

Cripps in the County of Sagadahoc, in 1855, none of which are reported in the Maine Reports, but distinctly recollected. The instruction given, having the weight of authority in its support, and not having been satisfactorily shown to be erroneous, is sustained."

We are not persuaded that this which has been the rule in Maine since 1834 should be abandoned. Petitioner takes nothing by this objection.

■ Petitioner complains the Court incorrectly and inadequately described the effect of intoxication on criminal intent.

In his instructions to the jury the Presiding Justice had this to say about intoxication:

"However, voluntary intoxication, that is to say, intoxication produced by the voluntary acts of the person imbibing, has never been recognized as an excuse for crime. Voluntary intoxication will not reduce murder to manslaughter. Neither will it aggravate or increase the degree of a crime. Neither is it available as a factor contributing to heat of passion. If the law permitted a lesser provocation to create heat of passion in an intoxicated person than is required in the case of a reasonable, sober man, the law would be granting a premium for voluntary intoxication."

The Presiding Justice correctly stated the law to be applied when the rule is applicable. In 1956 Chief Justice Fellows, speaking for this Court, described the rule in language much more colorful than that used by the Presiding Justice. In State v. Arsenault, 152 Me. 121, 124 A.2d 741, he said:

"The Court is unanimous in its opinion that the rule regarding the defense of

2. The Presiding Justice at the trial of *Knight* was Justice Richard Rice. Full text of the charge of the Presiding Justice and the briefs filed by counsel are reported in 43 Me. 11. Justice Rice's charge and that of Chief Justice Lemuel Shaw given in Commonwealth v. Webster, 5 Cush. 295, are undoubtedly the most widely quoted instructions ever given to a jury in homicide cases.

*insanity should never be extended to apply to voluntary intoxication in a murder case. It would not only open wide the door to defenses built on frauds and perjuries, but would build a broad, easy turnpike for escape. All that the crafty criminal would require for a well-planned murder, in Maine, would be a revolver in one hand to commit the deed, and a quart of intoxicating liquor in the other with which to build his excusable defense."*

See also: State v. Duguay, 158 Me. 61, 178 A.2d 129.

In the instant case, the Petitioner at his trial testified concerning his condition as he began the taxi ride which ended in the death of his victim. The evidence revealed that the taxi ride had begun in front of a Portland hotel and had ended some 10 miles away. During the day, the Petitioner says, he went into a place which he described as the Dutch Kitchen, two or three times. Then followed this testimony:

> "Q How much did you have to drink in the Dutch Kitchen, if you recall?
>
> A I usually had a couple of beers each time I went in.
>
> Q Would you say that you were perfectly clear mentally when you came out of there?
>
> A Yes, I would."

The Petitioner also testified that just before his taxi ride came to an end, he stopped at a house in Standish and inquired for directions of a lady. His counsel then put this question to him:

> "Now, would you say at that time and at the time you called at a certain lady's house you were sober?"

And he answered:

> "Yes, sir: I was sober."

This being the state of the testimony, there was no occasion to give instructions as to the effect of voluntary intoxication. State v. Mosley, 133 Me. 168, 175 A. 307. No possible prejudice could have resulted to the Petitioner by giving this instruction.

Petitioner's claim of error on this point is without merit.

■ The Petitioner claims the Justice presiding at the trial erred in permitting testimony concerning alleged admissions to be received in evidence and presented for consideration by the jury without first holding a hearing outside the presence of the jury and determining such admissions were made voluntarily. This, he says, was in violation of the rule laid down in Jackson v. Denno, 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908, and State v. Merrow, 161 Me. 111, 208 A.2d 659.

We have examined the transcript of the trial and we find in no instance was objection made to the receipt into evidence of any of the alleged admissions.

Absent an objection to the proferred evidence, there was no issue of fact to be decided, and, therefore, no occasion for hearing outside the presence of the jury.

In Duguay v. State, Me., 240 A.2d 738 (1968), this Court ruled Jackson v. Denno, supra, should be given retroactive application *"subject to recognized principles of waiver."* [3]

Since objections to the admission of the evidence was not registered at the trial, the point he now raises must be deemed waived.

■ The final point the Petitioner makes in his claims of error committed, he says, by the Justice in the trial Court was that the Justice made prejudicial comment in the presence of the jury when ruling on an objection made by Petitioner's attorney.

---

3. See: Stovall v. Denno, 388 U.S. 293 at 298, 87 S.Ct. 1967, 18 L.Ed.2d 1199. See also: State v. Bisanti, 233 Iowa 748, 9 N.W.2d 279. See also: State v. Richardson, 216 N.C. 304, 4 S.E.2d 852.

The trial record contains the following:

*"THE COURT: On that point I think it would be proper to admit it to show the difference in the stories he told."*

In the first place, no objection was made to this statement at the time of trial, and, therefore, must be considered as waived.

In the second place the Justice who presided at the habeas corpus proceeding correctly found the quoted statement was taken out of context and when considered in the context of the colloquy which preceded it, it could not be considered a prejudicial comment. This objection is without merit.

The last three claims of error are alleged by the Petitioner to have been committed by the Justice presiding at the habeas corpus proceeding.

With regard to all three claims:

VIII. There is newly discovered evidence.

IX. The State of Maine knowingly used false evidence in violation of the due process clause of the Fourteenth Amendment of the United States Constitution.

X. That the officials of the State of Maine knowingly suppressed material evidence in favor of the Petition to obtain a conviction in violation of due process of the Fourteenth Amendment to the Constitution of the United States.

the Presiding Justice found on the evidence before him, the Petitioner had not sustained the burden of proving his allegations by a fair preponderance of the evidence. Such findings were not clearly erroneous, and, therefore, must stand. Rule 52(a), M.R.C.P. Gordon v. State, Me., 232 A.2d 527 (1967).

All three issues were essentially questions of fact, concerning which the Justice presiding at the habeas corpus proceedings made findings adverse to the Petitioner.

█ The Petitioner claimed he discovered the existence of witness Chaplin whose testimony, he says, would have been material at the trial. He says the existence of the witness and the substance of his testimony was known to the investigating officers and was not revealed to the Petitioner's counsel.

Chaplin testified at some length before the Presiding Justice. His testimony was to the effect that he observed a taxicab with what he feels quite sure were three persons in it, two in front and one in back, a short distance from where the cab containing the body of the deceased was found. He says he told his story to several officers shortly after the homicide was discovered and they took a statement from him.

He was never called to testify.

The Presiding Justice found as follows:

*"My conclusion is that the testimony of Mr. Chaplin would not have been material or heplful to the petitioner at his trial and further find that the State did not suppress material evidence beneficial to the petitioner."*

In State v. Casale, 148 Me. 312, 92 A.2d 718, this Court described the tests to be applied on motions for a new trial on grounds of newly discovered evidence. The tests there described are:

*"(1) that the evidence is such as will probably change the result if a new trial is granted, (2) that it has been discovered since the trial, (3) that it could not have been discovered before the trial by the exercise of due diligence, (4) that it is material to the issue, and (5) that it is not merely cumulative or impeaching, unless it is clear that such impeachment would have resulted in a different verdict."*

Witness Chaplin lived in the area in which the homicide occurred. He himself

testified as to having gone into a grocery store and telling the proprietor and other people about having seen the taxicab in front of his home the night before, so that his claim of having seen the cab was not a secret in the area.

Obviously, that he claimed to have some knowledge of the incident surrounding the death of Lewis Chandler, Jr., could have been discovered by the exercise of reasonable diligence. For this reason and for the further reason that the Presiding Justice found the evidence would not be helpful to the Petitioner and would not change the result if a new trial were granted, his testimony cannot qualify as newly discovered evidence.

At the trial Brine himself testified that he and the driver were alone in the cab at least until some few seconds before the killing.

It is difficult to understand how the highly questionable testimony of Chaplin that he saw, through his living room window, what he thought were three persons in a cab some 125 feet away, would have affected the outcome of the trial, especially in light of the testimony of other witnesses, including Brine himself, that there were only two persons in the cab.

Points numbered 9 and 10 both relate to the testimony of one Laliberty. Laliberty, Brine says, committed perjury as a witness in the criminal trial; that he did so at the instigation of a Mr. Wheeler, Chief Investigator for the State. The witness had testified at the trial that on the night of the killing the taxicab stopped in the vicinity of his house which was a short distance from the place where Chandler's body was found, and a conversation was had concerning the residence of one Sullivan.

He then identified Brine as the man who was sitting in the back seat of the taxicab and with whom he had had conversation. This question was then asked:

"Q  Mr. Laliberty, is there any doubt in your mind as to whether or not Richard Brine, sitting here, is the man that you talked with in front of your house on the night of October 7, 1958?

A  That is the one."

At the hearing on the Petition for Habeas Corpus (post-conviction) Mr. Laliberty was asked this question.

"Q  Now, Mr. Laliberty, I will ask you at this time: Could you identify, or could you at any time identify Richard Brine as being the passenger in the back seat of that cab on October 7, 1958?"  (Colloquy)

He answered: "No."

This, Brine says, establishes Laliberty committed perjury at the trial. Brine's further allegation is that State knew the testimony was false and had induced the witness to testify falsely. His contention now is that this claim was established by the following testimony given by Laliberty in the habeas corpus proceedings.

"A  Well, we had went to this other room, next room to the County Attorney, and they told me this; they said that—

Q  Who went there, first?

A  Mr. Wheeler.  And he says, 'you can't'—

Q  That is Mr. Philip Wheeler?

A  Yes.  He says, 'You can't go in there,' he says, 'and say that you can't identify him.'  He says, 'You got to say that'—'you got to be sure.'"

Petitioner interprets Mr. Wheeler's statement, "You have got to be sure" (assuming arguendo that the witness' recollection is accurate as to the words used) as amounting to a direction to the witness to say that he was sure when he was not.

It must at all times be remembered Mr. Laliberty's testimony when accepted by the jury established that at a point some miles away from the scene of the shooting Brine was in a taxicab with a driver.

Brine himself says that when the Chandler cab finally came to a stop at the scene of the shooting, he, Brine, awoke; that he was alone in the cab with the driver who had visible bullet holes in him. Brine also says that some 30 seconds before when he fell asleep, as he left the Low driveway, he was alone in the cab with the driver.

Assuming for the moment it could have been someone other than Brine in *a yellow cab* when Laliberty saw the cab several miles from the scene of the shooting, there can be no possible doubt that Brine was the only man seated in *Chandler's cab* when it came to a stop after Chandler had been shot.

It is also to be noted that at the murder trial the question which was asked was, *"Is there any doubt in your mind as to whether or not Richard Brine, sitting here, is the man that you talked with in front of your house on October 7, 1958?"*

At the post-conviction hearing the question was framed as follows:

> *"Q Now, Mr. Laliberty, I will ask you at this time: Could you identify, or could you at any time identify Richard Brine as being the passenger in the back seat of that cab on October 7, 1958?"*

It is also important to note these questions asked and answers given on cross-examination at the hearing on the Petition for Habeas Corpus.

> *"Q Wasn't the testimony you gave at the trial about identification on Mr. Brine, wasn't that the truth?*
>
> *A Yes.*
>
> *Q In other words, when you were testifying in court you were trying to tell the truth.*
>
> *A Yes.*
>
> *Q You weren't trying to lie, were you?*
>
> *A No.*
>
> *Q Not trying to lie now, either, are you?*
>
> *A No.*
>
> *Q Now, that cab drove up to your property?*
>
> *A Yes.*
>
> *Q On October 7th. And you went out.*
>
> *A Yes.*
>
> *Q To talk to the driver.*
>
> *A Yes.*
>
> *Q Recognized the driver as the man who was shot and found further up the road, right?*
>
> *A Right.*
>
> *Q No question about that is there?*
>
> *A No."*

We have searched the record in this case with great care to the end that we could satisfy ourselves the entire proceedings were free from legal error. No errors have been found.

The Petitioner's court-appointed attorneys in the trial were experienced and capable trial lawyers. The record demonstrates they tried the case with skill. The record further makes it clear, even to the most casual reader, both Petitioner's court-appointed attorneys were thoroughly prepared.

The charge of the Presiding Justice, in our opinion, could properly be characterized as a model of excellence. It was well balanced as all good charges should be. It was clear and understandable. It was accurate.

The evidence marshaled by the State in support of the allegations in the indictment was overwhelming. The Petitioner himself

**539**

chose to testify in his own behalf. The story he told was remarkable for its inconsistencies and implausibility.

We find nothing in the evidence creating a doubt for which a conscientious fact finder could assign a reason to his conscience. The sentence which was imposed was mandatory. Justice has been done in full measure.

The entry must be,

Appeal dismissed.